Memorandum of Decision
On January 7, 1999, the Department of Children and Families (DCF) filed petitions to terminate the parental rights of Lloyd C. and Carolyn L. to their minor children: Adrian C., Lloyd C., Jr., and Andrew C. The court consolidated all petitions for trial, which took place on November 1, 2, and 3, and December 28, 1999, and January 21, 2000. For the reasons stated below, the court now grants the termination petitions.
FACTS
The court finds the following facts and credits the following evidence.
A. The Mother
CT Page 1457 The mother, Carolyn L., was born in Jamaica in 1970. She came to this country in 1982 to live with her father. Due to physical abuse by him, Carolyn was committed to DCF. She graduated high school and received some additional business training. In 1990, she gave birth to a girl, Brittany L., through a nonmarital relationship with Leroy C.
Shortly thereafter, Carolyn began another nonmarital relationship with Lloyd C.[2] On February 1, 1992, Carolyn gave birth to their twin sons, Adrian C. and Lloyd C., Jr.[3]
Through this relationship, Carolyn had another boy, Andrew C., on January 12, 1993.
DCF became involved with the family in 1995. The mother completed an intensive family preservation program in October, 1996, but the program concluded that the mother was not able to provide adequately for the needs of the children. On October 14, 1996, Hartford police discovered Carolyn with the four children in an apartment that was unsafe and unclean. They arrested Carolyn for risk of injury to minors and all four children went into temporary DCF custody. On March 25, 1997, the court adjudicated the children uncared for and committed them to DCF custody for one year.[4]
DCF referred the mother to individual counseling at Catholic Family Services, but the mother dropped out after several sessions. The mother completed the first phase of parenting and reunification classes at Catholic Family Services, but did not comply with their recommendation to remain in the program. The mother also did not maintain an apartment that would have been adequate for the children. The mother did visit her children regularly.
The mother attended a psychological evaluation in March, 1997 with Dr. Bruce Freedman. At that time, the mother showed signs of depression, poor judgment, inability to manage child care and housekeeping responsibilities simultaneously, and inconsistency with the children. In December, 1998, Dr. Walter Borden, a psychiatrist, found the mother to be significantly depressed and in need of psychotherapy and medication. Dr. Borden also found her to be highly ambivalent about treatment and not able to care for her children at that time.
The mother returned to Dr. Freedman for a second evaluation in April, 1999. Although the mother had obtained a job, Dr. CT Page 1458 Freedman found, on the basis of testing, that the mother still showed poor judgment and emotional immaturity. Based on observations and reports, Dr. Freedman found that the mother had only a visiting relationship of limited emotional strength with the boys. The twins had complained that the mother's apartment was dirty and smelly. The visits were having a disruptive effect on them.
As of June, 1999, DCF discontinued visits between the mother and the twins, although visits continued with Andrew and Brittany. The mother failed to appear for the termination trial.
B. The Father
The father was born in 1967. He was raised primarily by his own mother because his father abused drugs. He did not complete high school during his youth.
The father's first arrest took place in 1987. Since then he has been arrested twenty more times resulting in convictions and periods of incarceration for larceny, forgery, and other property crimes, as well as for burglary, failure to appear, possession of marijuana, and violations of probation. Most of the father's convictions stem from his drug habit.
The father was incarcerated when the twins were born in 1992. Upon his release, he and Carolyn lived at various times in an apartment, in a shelter, and with the paternal grandmother. While at the paternal grandmother's residence, there was domestic violence. The father was able to obtain employment when not in prison. The father eventually separated from the mother because she could not keep a clean household and was more interested in working than raising children. In addition, the father had developed a relationship with another woman. From this relationship, a baby girl, Jazmine, was born. The father served as primary care taker for Adrian, Lloyd, and Andrew at times because of the mother's work or, later, because of their separation.
The father went back to prison for the period between August, 1994 and November, 1997.[5] During this time period, the father obtained an associate's degree and completed numerous rehabilitative prison programs. He also visited monthly with his children.[6]
CT Page 1459
The father participated in the psychological evaluation with Dr. Freedman in March, 1997. Dr. Freedman found the father to be a balanced, intelligent individual who had worked hard during his prison term to become more functional in society. He found the father's interactions with the boys to be energetic, active, and surprisingly good, considering the limited contact he had had with them. Dr. Freedman felt that the father remained a potentially able care taker for the boys.
Upon the father's release from prison in November, 1997, he began visiting with his children weekly. The father told his children that they could home and live with him soon. In January, 1998, DCF referred the father to parenting classes and a family reunification program at Catholic Family Services. He initially invested considerable time and energy in attending the program. The father enjoyed the visits with his children but felt the parenting classes were unnecessary because he had taken a similar course in prison. The father failed to appear at two sessions in February primarily because of a conflict with his work schedule and transportation difficulties. The children were disappointed that the father did not attend.[7] The social worker at Catholic Family Services unsuccessfully attempted to contact the father about rescheduling. The DCF social worker assigned to the case sent the father a letter advising him that the visits and classes would be canceled unless he scheduled a meeting with DCF to discuss the matter. Upon receipt of the letter, the father apparently made some attempt to call DCF but never reached the assigned worker.
The father then failed to keep his whereabouts known or to contact DCF. He had a cocaine relapse. He told his girlfriend that he would get treatment if drugs became a problem again. On April 4, 1998, the father was arrested for assault on a police officer, unlawful restraint, and carrying a dangerous weapon. He made bond but failed to appear in court. He left his girlfriend and had another drug relapse. On June 13, 1999, the father was rearrested and charged with first degree larceny, credit card theft, and possession of marijuana. He was convicted of first degree larceny, issuing a bad check, assault on a police officer, carrying a dangerous weapon, and failure to appear in court. He remained incarcerated until December, 1999. No contact between the father and DCF occurred until December, 1998, when DCF learned of the father's incarceration through what DCF labeled a "diligent search."[8]
CT Page 1460
The father participated in the second psychological evaluation conducted by Dr. Freedman in April, 1999. This meeting was apparently the first between the father and the twins since February, 1998.[9] Dr. Freedman observed that the father was energetic and charming with the boys and entertained them with magic tricks and lively conversation. The boys, however, did not know much about the father and did not look to him for security, regular contact, or support. Dr. Freedman again found the father to be an intelligent man, but one who had a long history of irresponsible behavior. He recommended termination of the father's parental rights.
Over the years, the father has made only a few phone calls and sent only a few letters to the boys' foster homes. Most of the phone calls and letter writing took place in the spring of 1999. Lloyd in particular reacted adversely to one letter from his father. The twins, particularly Lloyd, became extremely upset after seeing their father at the April, 1999 psychological evaluation, apparently because they had seen their father in prison clothes and shackles. The father has not sent them any gifts for special occasions.
On the first day of trial, the father consented to the termination of his parental rights over Andrew. The father explained that he felt that Andrew was with good foster parents who wished to adopt him, that the foster parents would allow him to visit Andrew, that he did not have as much a relationship with Andrew as with the twins. He added that he believed that having custody of the twins was all that he realistically could handle.
The father testified at trial on November 2 and 3, 1999. He took some responsibility for his earlier criminal history, his drug problem, and his failure to maintain contact with DCF and his children after February, 1998. But he minimized his responsibility for his recent arrests, blaming his conviction on police misconduct and, to a lesser extent, the public defender system.[10] He had a dishonest manner of admitting some of the facts on a particular issue — for example, his drug relapse, his contemplated civil suit against the Hartford police, his purported child support payments — and then admitting the remainder of facts if there were subsequent questions. At times the father's testimony struck the court as simply unbelievable.[11]
During his most recent incarceration, the father was again a CT Page 1461 well-behaved and productive prisoner. He claimed at trial to have a job available for him upon his release and the potential to do some vocal recording. He planned to resume living with his fiancé, who has an apartment and an eight year old daughter from a different relationship. He testified to two somewhat contradictory plans for the twins. At one point, the father claimed that he sought to be reunited with the boys and that he had a bedroom available for them. Later, the father testified that he would just like to be available for the boys in the event that something happened to their current foster parents. The father, however, failed to appear for the last two days of trial on December 28, 1999 and January 21, 2000, despite ample notice from the court and DCF, and despite diligent efforts by his attorney to contact him.
C. DCF Misconduct
On cross-examination, the DCF case worker admitted that, while visiting the prison where the father was located in the late summer or fall of 1997, she engaged in "inappropriate behavior" in the visiting room with another inmate. She did not volunteer the nature of this behavior and no party asked her to be more specific. As a result of this incident, the warden of the prison prohibited the case worker from returning to this prison. This decision resulted in the cancellation of the two monthly visits between the father and his children that would have taken place in October and November, 1997, just before the father was released from prison.
The DCF social work supervisor was aware of the case worker's misconduct shortly after it occurred. The supervisor made a call to the prison but was not able to resolve the matter. The social work supervisor did not inform her supervisor, who is the program supervisor, and did not reassign the case to another case worker. The social work supervisor signed the social study submitted by the case worker which stated that the father was visiting his children monthly in prison and which made no mention of the visits canceled due to her own misconduct.
A subsequent program supervisor, Paul Shanley, testified credibly and candidly that the social work supervisor should have informed the prior program supervisor about the case and that one of them should have taken the case worker off the case. DCF is now investigating the matter for possible disciplinary action. DCF has transferred the case to another regional office based on CT Page 1462 the case worker's poor judgment and lack of credibility.
After the case worker's testimony, the father testified that, as part of the incident in question, the social worker asked him to smuggle some form of contraband to her inmate-friend. The father supposedly declined to do so. He then testified that the case worker asked him not to mention the incident and reminded him that it was up to her whether he could see his children. The father admitted that he did not report the alleged misconduct to either a DCF supervisor or to law enforcement authorities, stating that he did not want to get the case worker in trouble. The case worker did not take the stand to rebut these allegations. Mr. Shanley again testified convincingly that the ultimate decision to file a termination petition was his, that the case worker was actually reluctant to seek termination of the father's rights, and that he saw a sound basis, wholly independent of the allegations concerning the case worker, for filing the termination petition.
D. The Children
Andrew, who is now seven years old, has been in the foster home of John and Barbara H. for four years. He is a bright, artistic child. He identifies with his foster parents and does not frequently mention his natural parents. He gets along well with another foster child in the home. Adrian and Lloyd have been to this home to visit. The foster parents would like to adopt Andrew. They would allow him to have contact with his natural father.
Brittany, who is now almost ten years old, originally lived in the same foster family with Andrew. She has now moved to California to live with her father, Leroy C. Andrew has spoken to her on the phone. DCF's plan, which the juvenile court has already approved, is for a transfer of Brittany's guardianship to Leroy C.
Adrian and Lloyd are now eight years old. When they were about three years old, they entered a Head Start class taught by Carolyn B. Carolyn made several visits to the mother's home and saw that the boys were not living in habitable conditions. Two years later, after the boys had gone into foster care and been in three different foster homes, Carolyn B. and her husband Joseph volunteered to become their foster parents. CT Page 1463
The twins arrived at the B. home nervous, hungry, out of control, and complaining of rashes and ringworm. Carolyn and her husband have nursed them back to health through their devoted care. The children are involved in reading, the church, and playing sports with the couple's three biological children, who are in their twenties. The foster parents have encouraged visits with Andrew and phone contact with Brittany. The paternal grandmother has also visited. Adrian and Lloyd still have behavioral problems, particularly in school. They have reacted adversely to the fact that their natural father is in prison. Lloyd in particular has seemed confused about who his parents will be.
Since about June, 1999, Carolyn and her husband have felt that, because of health and other personal concerns, they cannot adopt the twins. Upon DCF's urging, they have agreed to reconsider their decision. If they do not change their mind about adoption, Mr. and Mrs. B. are committed to keeping the boys until DCF finds another adoptive home. DCF believes that the boys are adoptable, although they had not actively started to look for another adoptive home as of December, 1999. Carolyn has taught the boys that the natural parents still love them, even if they were not available for them, and that the children need to know who their natural parents are. Carolyn has stated that the boys interacted well with their parents in the past and that she hopes that, in the future, perhaps with assistance from counseling, the boys will be able to visit their father.[12]
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." General Statutes § 17a-112(c)(1). Such a finding is, however, "not required if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b
[dealing with permanency planning for committed children] that such efforts are not appropriate." General Statutes §17a-112(c)(1). On March 19, 1998, the juvenile court made such a finding concerning the parents, although entered the father's finding without prejudice. On February 4, 1999, the court again CT Page 1464 made such finding, this time without qualification. Although there are valid arguments that the father could have made at these hearings concerning DCF's failure to make reasonable efforts to reunify, the father, who has been represented by counsel throughout this case, apparently did not make these arguments. In view of the posture taken by the father, the fact that the court has twice held that reasonable efforts to reunify him with the boys was no longer appropriate, and the wording of § 17a-112 (c)(1), this court will not disturb these findings. This court will, however, consider DCF's misconduct and other evidence concerning their efforts in the dispositional portion of this opinion.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove clear and convincing evidence that one of several statutory grounds for termination exists. See In reMichael B., 49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied,247 Conn. 919, 722 A.2d 807 (1998); General Statutes §17a-112(c)(3). In this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a).
DCF has amended the petition concerning Andrew to allege consent by the father. General Statutes § 17a-112(b). DCF did not ask that this amendment affect the adjudicatory date with regard to the mother and the court does not construe it as having that effect. Thus, the adjudicatory date for all remaining contested grounds is January 7, 1999. These grounds are abandonment against the father and failure to rehabilitate against both parents. The court finds that DCF has proven its allegations by clear and convincing evidence.
1. Abandonment
General Statutes § 17a-112(c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In re Migdalia M.,6 Conn. App. 194, 208-209, 504 A.2d 533, cert. denied,
CT Page 1465199 Conn. 809, 508 A.2d 770 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id, 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id., 210.
Although the father's incarceration from August, 1994 to November, 1997 does not provide a complete defense to abandonment, it did make monthly visits the only opportunity the father had to see Adrian and Lloyd. See In re Juvenile Appeal(Docket No. 10155), 187 Conn. 431, 443, 446 A.2d 808 (1982). DCF deprived the father of even that limited opportunity during the fall of 1997 when its own misconduct resulted in the cancellation of two visits.
On the other hand, the father sent very little correspondence to his twin boys during this time period and did not send them any gifts on special occasions. He began seeing his boys weekly upon his release from prison in November, 1997. He then missed several visits, resulting in their cancellation. He did not arrange for their resumption with DCF. The father's whereabouts then became unknown for several months and he lost contact with his children. When the father returned to jail in June, 1998, he did not arrange for more visits with DCF. Although DCF was lax in not locating the father until December, 1998, the father had a moral obligation of his own to contact and support his children, regardless of DCF's efforts. See In re Juvenile Appeal (DocketNo. 9489), 183 Conn. 11, 15, 438 A.2d 801 (1981). The father did not fulfill this obligation. DCF has proven abandonment during the adjudicatory period by clear and convincing evidence.[13]
2. Failure to Rehabilitate
A second statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112(c)(3)(B)(1). No dispute exists that the court has adjudicated Adrian, Lloyd, and Andrew to be neglected on March 25, 1997, thus satisfying one element of the statute. CT Page 1466
The rest of the statute requires the court to find whether the parent has achieved "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112(c)(3)(C). The statute requires the court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.'"In re Luis C., 210 Conn. 157, 167, 554 A.2d 722 (1989). The statute, however, does not require parents "to be able to assume full responsibility for [a] child, unaided by available support systems." In re Juvenile Appeal (84-3), 1 Conn. App. 463, 477,473 A.2d 795, cert.denied, 193 Conn. 802, 474 A.2d 1259 (1984). Because of the requirement that the court predict what will happen within a "reasonable time" after the filing of the termination petition, it is sensible to conclude that the court can consider not only the parents' conduct before the filing of the termination petition, but also the conduct occurring after it.
Both parents failed to rehabilitate. The father was in prison from 1994 to 1997, although he made commendable progress there in addressing his shortcomings. Upon his initial release, however, he violated his parole. When next released in November, 1997, he again showed initiative in obtaining a job and visiting his children. The father was unable to manage both responsibilities, however. He stopped seeing his children and did not finish parenting classes. He then relapsed with drugs. He did not obtain treatment. His whereabouts became unknown. He was arrested in April, 1999, failed to appear in court, and then arrested again in June. His criminal conduct made him unavailable for his children for the next fifteen months. The father demonstrated that, during the adjudicatory period, he was unable to sustain a law-abiding, positive life outside the structure of prison walls. DCF has proven its case against the father by clear and convincing evidence.
The mother's case involves equally important, although somewhat different concerns. The mother dropped out of individual counseling at Catholic Family Services and did not follow their recommendation to remain in parenting classes after completing the initial phase. The mother did not maintain a safe and clean apartment that would be healthy for children. Most importantly, she had mental health problems that she did not address. She did CT Page 1467 not develop a parent-child relationship with her children. The court accordingly finds by clear and convincing evidence that the mother failed to rehabilitate herself during the adjudicatory period.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." General Statutes § 17a-112(c)(2). The court can consider all events occurring through the close of the dispositional hearing. See Practice Book § 33-5.
The best interest of Andrew clearly and convincingly justifies termination of his parents' rights. The father has consented to termination. The mother failed to rehabilitate during the adjudicatory period. During the past year, she has continued to display poor judgment and emotional immaturity. She has not maintained an adequate apartment. She has only a limited relationship with Andrew. She failed to appear for trial.
Andrew has prospered in the foster home of John and Barbara H., where he has been for four years. Andrew considers the foster parents as his father and mother and the foster parents, in turn, wish to adopt him into their family. The foster parents intend to take an enlightened approach to adoption and allow the natural father to have contact with Andrew. Termination of parental rights to Andrew will facilitate this desirable outcome.
The mother's parental rights to Adrian and Lloyd should also be terminated because of the mother's continuing failure to rehabilitate, including her failure to contest this case. The father's case is more complicated. In November, 1999, when the trial in this case began, the father appeared as a person who had some rehabilitative potential and who could relate well to his twin boys. The boys were being well cared for by foster parents who did not want to adopt and who had expressed a belief that the boys should get to know their natural parents. Although DCF's plan was nominally adoption, the DCF office handling this case had not identified a home that was committed to adoption. Despite the fact that these boys had been in foster care for almost three years, DCF persisted in the quixotic hope that the foster parents would change their mind about adoption without developing a realistic alternative plan. In short, DCF had not meaningfully CT Page 1468 addressed the permanency needs of these boys which, unfortunately, was typical of its mismanagement of this case at the time. Given all these facts, there seemed no compelling reason why the father should not retain his rights to the twins, seek visitation, and regain custody in the event that the foster parents no longer wished to raise the boys and the father had sufficiently rehabilitated.
Two things have changed. First, DCF wisely transferred this case to another regional office, which appears much more energetic about finding an adoptive home for the twins and concerned about the mismanagement of the case to date. Second, the father failed to appear for the last two days of trial, despite ample notice. It appears that, now that he is out of prison, the father has lost interest in his twin boys. Given that the father apparently no longer seeks to retain any rights to his boys, this case should proceed to adoption. Termination of parental rights and adoption by a new family will hopefully provide Lloyd and Adrian the permanency and stability to which they are fully entitled. See In re Juvenile Appeal (83-CD),189 Conn. 276, 292, 455 A.2d 1313 (1983).
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112(e). See In re Tabitha P., 39 Conn. App. 353,362, 664 A.2d 1168 (1995). These factors serve only to guide this court in making the ultimate decision whether to grant the termination petition, and no one factor is a prerequisite. See Inre Eden F., 250 Conn. 674, 691, ___ A.2d ___ (1999). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF provided foster care for the children and offered the natural parents visitation. DCF also made referrals for the parents to a variety of social service agencies. These services were relevant to the parent's needs and were offered in a timely manner, but the parents did not take advantage of them.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980. CT Page 1469
Based on the foregoing discussion, the court finds that DCF offered the mother appropriate services and guidance, and sufficient time to permit family reunification. On the whole, DCF did not make reasonable efforts to reunite the father given DCF's responsibility for the cancellation of two prison visits and its failure to make a diligent search for the father in 1998. This failure by DCF does not affect the disposition of this case, however, because the father has lost interest in his twin boys and thus is unable or unwilling to benefit from additional reunification efforts.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
On March 25, 1997, the court entered the following expectations for the parents to meet to facilitate the return of the children to their custody: (1) keep all appointments set by or with DCF, (2) keep whereabouts known to DCF and your attorney, (3) visit the children as often as DCF permits, (4) participate in the following counseling: parenting, drug and alcohol (father only), and individual (mother only) and follow recommendations (including psychiatric evaluation for the mother), 5) sign releases as requested, and 6) secure and maintain adequate housing and income. For the mother, there was an additional expectation of cooperating with in-home services. For the father, there were additional expectations to refrain from substance abuse and have no further involvement with the criminal justice system. The parents' compliance with the more significant of these expectations was generally poor.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
All the children have become attached to their foster parents. Andrew has a visiting relationship with his natural mother and some familiarity with his father. The twins no longer have any relationship with their natural parents.
5) The age of the child. CT Page 1470
Adrian and Lloyd are eight years old. Andrew is seven.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that parents did not adjust their circumstances in time to make it in the children's best interest to return to their home. The parents' contact with the children and their care takers was limited.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As discussed above, the mother experienced some domestic violence when living with the father. This fact, however, is not principally responsible for the mother's lack of a parental relationship with her children. The parents' difficulties stem primarily from their own lifestyle choices and not from unreasonable interference by each other or any third person.
CONCLUSION
Based upon the foregoing findings, the court hereby grants the termination petitions. The Commissioner of DCF is appointed statutory parent for the children for the purpose of securing adoptive families. If the respective foster parents are willing to adopt, it is the court's direction that they receive first consideration. The extension motions are denied as moot. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law. CT Page 1471
It is so ordered.
Carl J. Schuman Judge, Superior Court